# In the United States Court of Federal Claims

No. 15-440C
(Filed Under Seal: May 29, 2015)
(Reissued for Publication: June 15, 2015)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| BANNUM, INC., | \* | |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| v. | \* | Preliminary Injunction; Judgment on |
| | \* | the Administrative Record; |
| THE UNITED STATES, | \* | Competition in Contracting Act, |
| | \* | 31 U.S.C. § 3553(d)(3); |
| Defendant, | \* | Bid Protest; Solicitation; Override; |
| | \* | Stay; Residential Re-Entry Services |
| and | \* | |
| | \* | |
| DISMAS CHARITIES, INC., | \* | |
| | \* | |
| Defendant-Intervenor. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Justin T. Huffman, Auburn, NY, with whom was Joseph A. Camardo, Auburn, NY, at argument, for plaintiff.

Devin A. Wolak, United States Department of Justice, Washington, DC, for defendant.

Alexander D. Tomaszczuk, McLean, VA, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court in this bid protest is plaintiff Bannum, Inc.'s motion for a preliminary injunction and defendant's cross-motion for judgment on the administrative record. Plaintiff was the incumbent contractor providing the Federal Bureau of Prisons ("BOP") with Residential Reentry Center ("RRC") Services for federal offenders ("inmates" or "residents") in Clarksburg, West Virginia. Prior to the expiration of plaintiff's then-existing contract, the BOP issued a new solicitation for RRC Services in northern West Virginia. Plaintiff and one other offeror submitted proposals. During the procurement process, plaintiff filed one Government Accountability Office ("GAO") protest, and subsequently, two agency-level protests; all were

---

[1] The court provided the parties with an opportunity to suggest redactions to this ruling, but in a June 12, 2015 joint status report, they indicated that no redactions were necessary.

unsuccessful.  Because these protests extended the procurement, the BOP entered into three separate bridge contracts with plaintiff.  Ultimately, the BOP awarded the new contract to Dismas Charities, Inc. ("defendant-intervenor" or "Dismas").  Because it filed a postaward protest with the GAO within ten days, plaintiff was entitled to an automatic stay pursuant to the Competition in Contracting Act ("CICA").  See 31 U.S.C. § 3553(d)(3) (2012).  During the pendency of the GAO protest, plaintiff's third bridge contract with the BOP expired.  Rather than enter into a fourth bridge contract with plaintiff, the BOP exercised its option under a separate contract with defendant-intervenor to transfer some of the inmates to Dismas's RRC facility located in Charleston, West Virginia.  The BOP transferred the remaining inmates to an RRC facility in Pittsburgh, Pennsylvania operated by Renewal, Inc. ("Renewal"), pursuant to an existing contract with it.  The discrete issue in this protest is whether the BOP's transfer of residents from plaintiff's Clarksburg RRC facility to defendant-intervenor's and Renewal's respective RRC facilities, pursuant to contracts that are distinct from the one currently being protested before the GAO, resulted in a de facto override of the CICA stay.  For the reasons set forth below, the court grants defendant's motion and denies plaintiff's motion.

## I.  BACKGROUND

On June 5, 2012, the BOP issued Request for Proposals ("RFP") 200-1179-MA ("solicitation"), soliciting proposals to provide RRC Services for "male and female federal offenders" in any one of several named counties in northern West Virginia.[2]  AR 1.  The solicitation required the contractor to offer a community-based residential and nonresidential correctional service, including providing employment, residence development, and other self-improvement opportunities, in order to assist inmates in transitioning from a prison environment to the community at large.  Id. at 47.  On July 26, 2012, plaintiff filed a preaward bid protest with the GAO that challenged certain terms of the solicitation.  Id. at 511-18.  The BOP then extended the proposal submission deadline indefinitely, stating in its amendment to the solicitation that another amendment establishing the new proposal deadline would be issued at a later date.  Id. at 235.  Subsequently, on August 15, 2012, the BOP took corrective action by making certain revisions to the solicitation, and changing the proposal submission deadline to October 1, 2012.  Id. at 236-37.  The next day, or August 16, 2012, the GAO dismissed plaintiff's protest as academic.  Id. at 519.

On February 11, 2013, the BOP sent both plaintiff and defendant-intervenor individualized letters stating that their respective proposals fell within the competitive range of the solicitation, and requesting additional information.  Id. at 279, 456.  Defendant then entered into discussions with Dismas between February and April 2013.  Id. at 480, 486, 496.  The BOP also engaged in discussions with plaintiff between February 2013 and June 2014.  Id. at 305, 343, 347, 356, 360, 423, 426, 436, 440, 443, 447.  The BOP's discussions with plaintiff during this period concerned various construction code and permit requirements for plaintiff's plans to repair and improve its facility, and also pertained to plaintiff's goal of constructing a new parking lot.  Id. at 423-55.  During these discussions, plaintiff filed two agency-level protests.

_____

[2]  The court derives the facts in the "Background" section from the administrative record ("AR") and from the appendix attached to defendant's response to plaintiff's motion for a preliminary injunction ("Def.'s App'x).

The first was filed on January 7, 2014, <u>id.</u> at 520, which the BOP denied on February 20, 2014, <u>id.</u> at 522.  Plaintiff filed its second agency-level protest on June 11, 2014, <u>id.</u> at 523, which the BOP denied in part and dismissed in part on July 17, 2014, <u>id.</u> at 528.

At the time that the solicitation was issued in 2012, plaintiff was in the incumbent contractor for the existing BOP contract for RRC Services in Clarksburg, West Virginia.  <u>Id.</u> at 539.  That contract expired on July 31, 2013.  <u>Id.</u> at 711.  Subsequently, because the procurement was ongoing, defendant issued a limited sole-source bridge contract to plaintiff for August 1, 2013, through February 28, 2014.  <u>Id.</u> at 711, 715.  Because no contract award had been made by February 28, 2014, defendant entered into a second seven-month sole-source bridge contract with plaintiff for March 1, 2014, through September 30, 2014.  <u>Id.</u> at 727.  At the time that the second bridge contract expired and no contract award had been made, once again, plaintiff was awarded a third seven-month sole-source bridge contract for October 1, 2014, through April 30, 2015.  <u>Id.</u> at 736.  In addition, on November 12, 2014, the BOP entered into a contract modification to its existing contract with Dismas, "exercis[ing] a six-month extension for [RRC] Services in Charleston[,] West Virginia" for December 1, 2014, through May 31, 2015.  <u>Id.</u> at 899.

In early January 2015, BOP monitors visited plaintiff's Clarksburg facility after a heavy snowstorm.  <u>Id.</u> at 798.  They observed that water was leaking in several areas of the men's dormitory ceiling, causing damage that risked a ceiling collapse, among other hazards.  <u>Id.</u> After the BOP monitors expressed concerns, plaintiff's facility manager contacted the Clarksburg fire department, which inspected the space and found significant water penetration that posed a threat to the electrical system.  <u>Id.</u>  Because the BOP monitors observed that the ceiling tiles were falling, that the insulation and wood studs were saturated with water, and that water continued to gather in the light fixtures, plaintiff relocated the residents to a hotel, so that these issues could be resolved.  <u>Id.</u> at 799-800.  Before the residents were moved, John Rich, plaintiff's president, "disputed the need to relocate the residents" in an electronic-mail message.  <u>Id.</u> at 799.  By January 13, 2015, the ceiling had stopped leaking, the lights were working again, and the residents were moved back to plaintiff's facility.  <u>Id.</u> at 807.

On January 22, 2015, the BOP issued to plaintiff a report, based on its full monitoring inspection of plaintiff's facility, describing the deficiencies that the monitors had observed.  <u>Id.</u> at 752.  Specifically, the BOP found that:  carpets throughout the facility were stained and dirty, there was excessive dust and lint behind appliances, the refrigerator housing resident meals was excessively dirty with mold and spilled liquids, and the resident food lockers were dirty and contained a dark, sticky substance on the shelves.  <u>Id.</u> at 754.  In addition, plaintiff's meal log system did not provide any means by which defendant could ensure that the residents were being fed.  Def.'s App'x 5.  When the BOP monitors weighed portions of a meal served on a particular day to determine if dietary minimums were being met, they found that the meal weights did not match menu requirements.  <u>Id.</u>  Specifically, they found that for several foods, the served portion was often 0.3 ounces to 1.3 ounces less than what was required.  <u>Id.</u> Moreover, when plaintiff undertook medicine distribution, the tracking log numbers were at times filled out incorrectly, with no running count of medication, and in some cases, no policies and procedures regarding control and distribution of medication.  <u>Id.</u>

Further, plaintiff lacked satisfactory fire evacuation and emergency plans, and there was no effective communication between plaintiff and the United States Probation Office's staff. AR 754. In addition, plaintiff lacked proper policies and procedures for a public information program that offered ongoing, positive communication between the facility and the local community, elected officials, law enforcement, and citizens. Id.

On February 20, 2015, plaintiff submitted a thirteen-page response to the BOP's report. Id. at 770. Plaintiff indicated that it had cleaned the facility's floors and food storage areas, but disagreed with and challenged other findings in the report, asserting that some were not violations of its contract with defendant, and demanding that at least one of the outlined deficiencies be withdrawn. Id. at 770-82. The BOP provided plaintiff with its reply on March 6, 2015. Id. at 786. The BOP noted that plaintiff had resolved the sanitation issue, but disputed many of plaintiff's other contentions. Id. at 787-91. On March 13, 2015, plaintiff filed a grievance regarding defendant's January 2015 monitoring report, and the BOP responded on May 1, 2015, sustaining all of the contracting officer's original conclusions that were adverse to plaintiff. Id. at 833-35.

With respect to the solicitation, the BOP made twelve minor amendments thereto,[3] id. at 229-74, and on March 30, 2015, awarded Dismas the contract to provide RRC Services for northern West Virginia. Id. at 275. This was not the first time that defendant entered into a contract with defendant-intervenor for RRC Services. The two parties had previously signed a contract for RRC Services in 2008, which had been modified on several occasions thereafter. Id. at 874-903.

On March 31, 2015, plaintiff submitted to the BOP a claim protesting the contract award to defendant-intervenor and alleging that the BOP had engaged in "intentional, bad faith conduct" and "breaches of contract." Id. at 836. Plaintiff also filed the aforementioned GAO protest on April 6, 2015, arguing that:

> (1) the BOP improperly accepted Dismas's untimely submitted proof of all zoning and local ordinance requirements necessary for the operation of Residential Reentry Center at its facility locations, in violation of the terms of the RFP; (2) the BOP improperly delayed the award of the contract in order to improperly allow Dismas additional time to provide the approved to use; (3) the proof of zoning provided by Dismas was in violation of City ordinances, and; (4) the BOP improperly used its monitoring authority of Bannum's performance to downgrade Bannum's Past Performance evaluation.

Id. at 531. Because plaintiff filed a protest with the GAO, on April 10, 2015, the BOP issued a Stop-Work Order requiring that "[a]ll [RRC] services, subcontracting, and all actions pertaining to [the northern West Virginia] contract [be] suspended." Id. at 277. The Stop-Work Order set forth that "[a]ll performance must be stopped from the effective date of the stay of

---

[3] Defendant made such amendments on: June 6 and 29, 2012; July 31, 2012; August 15, 2012; September 12, 2012; February 7, 2013; August 5, 2014; December 29, 2014; January 14 and 21, 2015; and February 19, 2015.

performance." Id.  On that same date, the BOP sent defendant-intervenor a letter informing it that plaintiff's GAO protest had been filed, and stating that "[a]s a result, performance under Contract No. DJB200232, awarded to Dismas Charities, Inc. on March 30, 2015, must be stayed, pending disposition of the protest, or until otherwise authorized under [BOP] procedures." Id. at 278.  The letter continued, "[e]ffective April 10, [2015], this letter and attached modification 0001 suspends any and all performance under Contract No. DJB200232." Id.

Subsequently, the BOP notified plaintiff in two separate letters, both dated April 14, 2015, of two infractions at plaintiff's Clarksburg facility.  In one letter, the BOP indicated that it had received evidence that the director of the facility had arrived at work intoxicated and had exhibited unprofessional conduct. Id. at 827.  In the other notice, the BOP stated that a Counselor Aide had engaged in discrimination and unprofessional conduct. Id. at 832.  The BOP directed plaintiff to restrict individuals from working with federal inmates at the Clarksburg facility until further notice. Id. at 827, 832.  Mr. Rich responded to each notice by electronic-mail message. Id. at 828, 831.  He addressed each message to Timothy Barnett, a BOP Residential Reentry Manager, stating that defendant had not provided evidence of the respective allegations, demanding the specifics of each infraction, "object[ing]" to the BOP's "course of conduct," contending that the "letter[s] and [Mr. Barnett's] actions [we]re contractually unacceptable" to plaintiff, and concluding that Mr. Barnett should "GOVERN [HIM]SELF ACCORDINGLY." Id. at 828-29.  The next day, April 15, 2015, plaintiff filed a claim with the BOP for "contract interpretation and intentional interference with [plaintiff's] contract." Id. at 859-60.

Plaintiff's third seven-month sole-source bridge contract to provide RRC Services for the BOP in Clarksburg expired on April 30, 2015. Id. at 737.  On April 17, 2015, Thomas DiPaola, a Sector Administrator in the Residential Reentry Management Branch at the BOP, sent an electronic-mail message to BOP employees Peter Brustman and Clay B. Kiser, as well as others stating that plaintiff's third bridge contract would expire on April 30, 2015, and that Dismas "ha[d] been awarded the new contract with a scheduled start date of August 1, 2015." Id. at 866.  He continued:

> In the meantime, [plaintiff] has filed a protest and [Office of General Counsel ("OGC")] and contracting are working on the resolution of this issue.
>
> After consultation with OGC and Contracting, Eastern Sector has developed a plan for movement of the inmates upon expiration of the Bannum contract on April 30, 2015.  This plan includes moving the inmates into other facilities and a plan for continued programming at those facilities.
>
> We are fortunate to have a few facilities within a few hours['] travel time from Clarksburg, WV. . . .
>
> Please note that CBR staff will start the re-routing of the referral packets asap and then oversee the inmate transfer process on the evening of Thursday[,] April 30, 2015.

Id. Mr. DiPaola's message also indicated that in total, forty-two inmates would be relocated. Id. Of these, twenty-three inmates would be assigned to Renewal's Pittsburgh, Pennsylvania facility,[4] which included eighteen inmates who would receive RRC Services at the facility and five inmates who would be relegated to home confinement. Id. The remaining nineteen inmates would be assigned to defendant-intervenor's Charleston, West Virginia facility, of which eight inmates would receive RRC Services at the facility, and eleven inmates would be relegated to home confinement. Id. Thus, twenty-six of the forty-two inmates would be physically moved to these other facilities, while the remaining sixteen would be assigned to home confinement. Id. at 866-70. On April 27, 2015, defendant notified plaintiff of its decision to relocate the inmates upon expiration of the third sole-source bridge contract. See id. at 871-72.

## II.  PROCEDURAL HISTORY

On May 1, 2015, plaintiff filed the present bid protest and motion for a preliminary injunction. Plaintiff contends that after filing its bid protest with the GAO, it was entitled to an automatic stay pursuant to CICA. Plaintiff argues that because the BOP failed to provide the requisite written notice of its decision to transfer inmates to defendant-intervenor's and Renewal's respective facilities, the transfer amounted to a de facto override of the stay, thus violating CICA. Further, plaintiff alleged in its complaint that the BOP, particularly Mr. Barnett, demonstrated bad faith when dealing with plaintiff. Compl. ¶ 32. However, plaintiff abandoned its bad faith claim(s) at oral argument, Oral Argument of May 15, 2015, Argument of Mr. Joseph A. Camardo at 2:40:11.[5] Defendant filed a response and cross-motion for judgment on the administrative record; defendant-intervenor filed a response; and plaintiff submitted its reply. Oral argument was conducted on May 15, 2015.

## III.  LEGAL STANDARDS

### A.  Bid Protests

The United States Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001). Further, the United States Court of Appeals for the Federal Circuit has held that this court possesses jurisdiction to review an alleged violation of a CICA stay of performance under its bid protest jurisdiction. RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1290 (Fed. Cir. 1999).

---

[4]  The BOP and Renewal previously signed a contract for RRC Services on June 28, 2010, which allowed for the provision of such services through July 31, 2015. AR 904-905.

[5]  The oral argument held on May 15, 2015, at 2:30 p.m. Eastern Daylight Time was recorded using the court's Electronic Digital Recording ("EDR") system. The times noted in citations to the oral argument refer to the EDR of the oral argument.

When resolving a motion that arises from a bid protest, the court reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). When a protester claims that the procuring agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial." Impresa, 238 F.3d at 1333 (internal quotation marks omitted). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." Advanced Data Concepts, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

## B.  Preliminary Injunctive Relief

Courts "ordinarily refrain from interference with the procurement process . . . ." United States v. John C. Grimberg Co., 702 F.2d 1362, 1372 (Fed. Cir. 1983). In bid protests, the Tucker Act provides that

> the court may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.
>
> [T]he court shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

28 U.S.C. § 1491(b)(2)-(3). Preliminary injunctive relief is an extraordinary and drastic remedy, Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam), and the decision to grant injunctive relief falls within the sound discretion of the trial court, FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see also PGBA, LLC v. United States, 389 F.3d 1219, 1225-26 (Fed. Cir. 2004) (determining that the statutory scheme for reviewing procurements "does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate").

As the United States Supreme Court has held, a preliminary injunction is designed "merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). The standard for determining whether to grant a preliminary injunction in bid protests is well established. In order to secure such relief, the moving party must demonstrate that:  (1) it is likely to succeed on the merits; (2) it will be irreparably harmed without injunctive relief; (3) the harm it will suffer outweighs the harm to the government and to third parties; and (4) the public interest favors the grant of injunctive relief. Am. Signature, Inc. v. United States, 598 F.3d 816, 823 (Fed. Cir. 2010) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 19 (2008)); FMC Corp., 3 F.3d at 427. "No single factor is determinative, and the weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp., 3 F.3d at 427. Nevertheless, "the absence of an

adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify . . . denial" of a preliminary injunction. Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953 (Fed. Cir.1990).  Because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear.  See Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 380-81 (2003), aff'd, 365 F.3d at 1345; Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 566 (2000).

## C. CICA

Under CICA, if a federal agency "awarding [a] contract [pursuant to a procurement] receives notice of a protest" within ten days of the contract award or five days of a required debriefing offered to an unsuccessful offeror, whichever is later, "the contracting officer may not authorize performance of the contract to begin while the protest is pending[,]" or if performance had begun prior to the protest, "the contracting officer shall immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract."  31 U.S.C. § 3553(d)(3) (2012); see also id. § 3553(d)(4); 48 C.F.R. § 33.104(c)(1).  Pursuant to 48 C.F.R. § 33.104(d), if the contracting officer decides to proceed with the contract award or continue performance, thus overriding the stay, the contracting officer must furnish the protestor and other interested parties with written notice of that decision.

## IV.  DISCUSSION

As described earlier, plaintiff was the incumbent contractor providing the BOP with RRC Services in Clarksburg, West Virginia.  AR 711.  On June 5, 2012, the BOP issued the RFP, seeking RRC Services for inmates in northern West Virginia.  Id. at 1.  For the next three years, plaintiff filed three protests that delayed the award of the contract.  The procurement continued, and plaintiff's existing contract expired on July 31, 2013.  Id. at 711.  Consequently, in the absence of a contract award, the BOP executed three consecutive seven-month sole-source bridge contracts with plaintiff.  Id. at 711, 715, 727, 736.  Ultimately, on March 30, 2015, while plaintiff's third sole-source bridge contract was ongoing, defendant awarded the contract for RRC Services in northern West Virginia to Dismas.  Id. at 275.  On April 6, 2015, plaintiff filed its protest with the GAO, id. at 531, and on April 10, 2015, the BOP suspended all actions pertaining to the newly awarded contract to Dismas, id. at 275, 277-78.  Because plaintiff filed its protest within five days of receipt of the debriefing letter, plaintiff was entitled to an automatic stay under CICA.  48 C.F.R. § 33.104(c)(1).  Plaintiff's third seven-month sole-source bridge contract expired on April 30, 2015.  AR 736.  After that date, defendant transferred the inmates from plaintiff's Clarksburg facility to defendant-intervenor's facility in Charleston, West Virginia and Renewal's facility in Pittsburgh, Pennsylvania.  Id. at 866.

In its motion, plaintiff contends that because defendant failed to provide the requisite written notice of the transfer of inmates, the transfer amounted to a de facto override of the automatic stay, thus violating CICA.  Pl.'s Mot. 4, 7.  Plaintiff alleges injury arising from the transfer of inmates, which required Bannum to shut down its Clarksburg facility, resulting in the loss of a significant number of employees.  Id. at 4-5.  Additionally, plaintiff argues that an injunction is justified because the transfer of inmates to two other cities, each over 100 miles

away, interrupted the inmates' "entire treatment plan" by severing their ties with the Clarksburg community.  Id. at 5.  Given the totality of the circumstances, plaintiff asserts, the BOP should be preliminarily enjoined from transferring the inmates to defendant-intervenor's and Renewal's respective facilities.  Id. at 14.

The court rejects plaintiff's contentions.  First, plaintiff cannot prevail because the BOP's transfer of the inmates to other RRC facilities pursuant to separate, pre-existing contracts between the BOP and Dismas, and between the BOP and Renewal, respectively, did not constitute a de facto override of the CICA stay.  The newly awarded contract for RRC services in northern West Virginia, which is the subject of the pending protest before the GAO, is wholly distinct from the extension of the BOP's pre-existing contract with Dismas and from the use of the BOP's pre-existing contract with Renewal to provide RRC Services at their respective facilities in Charleston, West Virginia and Pittsburgh, Pennsylvania.  Indeed, "[w]hile an override is meant to authorize performance on the protested contract because of special circumstances," the extension of a pre-existing contract to provide services during the pendency of the protest is "a separate, self-contained contract."  Access Sys., Inc. v. United States, 84 Fed. Cl. 241, 243 (2008).  For example, the BOP's three seven-month sole-source bridge contracts with plaintiff were merely "interim contract[s]" to perform the "exact same services" required by the June 2012 solicitation.  Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 708 (2006).  These contracts were initiated to fulfill the BOP's need for RRC Services as the procurement process continued, and were different from the contract that was ultimately awarded to defendant-intervenor pursuant to the solicitation.  Similarly, when plaintiff's third bridge contract expired on April 30, 2015, the BOP's transfer of some inmates from plaintiff's facility to defendant-intervenor's facility constituted an extension of a pre-existing contract to perform the same services required by the solicitation, in order to fulfill the BOP's need for RRC Services during the pendency of the GAO protest.  Along the same lines, the BOP's transfer of the remaining inmates from plaintiff's facility to Renewal's facility was the use of an existing contract to obtain the same services required by the solicitation.  The BOP's extension of its pre-existing contract with Dismas and the BOP's use of its pre-existing contract with Renewal is different from the newly awarded contract award that plaintiff is protesting before the GAO.

Plaintiff contends that "some amount of th[at newly awarded] contract work (i.e. inmate referrals) [is] being given to" Dismas under the extension of its pre-existing contract with the BOP, and that the court in Access Systems held that that is a "functional equivalent of an override."  Pl.'s Reply 3.  Contrary to plaintiff's assertion, in Access Systems, the court specifically held that if the other "contract is for the identical . . . services involved in the original contract, this fact alone is insufficient to prove that the [other] contract is an iteration, in whole or in part, of the original contract and, thus, an override."  84 Fed. Cl. at 243.  Indeed, the court reasoned that "[c]ontracts may share the same subject matter and yet remain separate and distinct from one another," and that the other "contract is not a partial iteration of the original contract but is a new contract with a distinct character and function."  Id.  Thus, even as the subject matter of the two contracts here is the same—i.e. providing RRC Services to the same group of inmates—the contracts are distinct, and therefore, extending the BOP's pre-existing contract with Dismas did not override the stay of the newly awarded contract pursuant to the solicitation.

Second, the court is similarly unpersuaded by plaintiff's argument that there was no reason for the transfer of inmates because, as the incumbent contractor, it had a "fully compliant

facility." Pl.'s Mot. 8.  Pursuant to 18 U.S.C. § 3621(b), Congress conferred on the BOP the authority and discretion to "designate the place of [a federal] prisoner's imprisonment."  The BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the [BOP], whether maintained by the Federal Government or otherwise . . . that the [BOP] determines to be appropriate and suitable, considering . . . the resources of the facility contemplated[,]" among other factors.  18 U.S.C. § 3621(b).  Moreover, the BOP "may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another."  Id.  Here, plaintiff provides no evidence for its contention that its facility was fully compliant.  It appears that the predicate for plaintiff's argument is its sense of entitlement to a fourth bridge contract.  There is no legal support for plaintiff's view.  The law is well settled that the court will not consider arguments made without proper substantiation.  Gilda Indus. Inc. v. United States, 446 F.3d 1271, 1281 (Fed. Cir. 2006) (stating that attorney argument is not considered evidence).

Third, there is no dispute that the BOP retained the authority conferred upon the agency by Congress to make the decision regarding where to assign inmates.  The court notes that the BOP's inspection of plaintiff's Clarksburg facility revealed concerns regarding sanitary conditions, inmates' physical safety, and satisfactory provision of food and medicine.  The BOP was also aware of unprofessional conduct demonstrated by two of plaintiff's staff members, one who engaged in discriminatory behavior, and the other, the director of the facility, who arrived at work intoxicated.  It is clear that the BOP exercised the discretion granted to it by Congress when declining to offer plaintiff a fourth bridge contract, and instead chose to exercise its rights under separate, pre-existing RRC Services contracts with defendant-intervenor and Renewal, respectively.  See Def.'s App'x 4-6.  Moreover, defendant merely extended its pre-existing contract with Dismas and used its pre-existing contract with Renewal to meet the ongoing need for RRC Services until the current GAO protest is resolved.

Finally, plaintiff objects to defendant-intervenor receiving a transfer of inmates pursuant to its separate, pre-existing contract with the BOP, arguing that the inmates should have been temporarily transferred to plaintiff's Wheeling, West Virginia facility, instead. [6]  Pl.'s Reply 3.

---

[6]  In its "Reply Memorandum and Opposition to Defendant's Cross-Motion for Judgment on the Administrative Record," plaintiff argues for the first time that defendant's decision not to transfer the inmates to plaintiff's Wheeling facility lacked a rational basis. Pl.'s Reply 5.  At oral argument, plaintiff explained that it raised this argument for the first time in the reply brief because it was unaware of which inmates were "being assigned" to which facilities, and overall, "what was happening," and that it only learned this information after defendant filed Mr. DiPaola's affidavit outlining this information.  Oral Argument of May 15, 2015, Argument of Mr. Joseph A. Camardo at 2:48:16.  In response, defendant argued that plaintiff was aware that inmates were being transferred to Charleston, West Virginia well before defendant filed Mr. DiPaola's affidavit, as plaintiff referenced this location by name in its motion and specifically noted that inmates were being reassigned there.  Oral Argument of May 15, 2015, Argument of Mr. Devin A. Wolak at 3:12:25.  Further, defendant contended, plaintiff would have known well before the affidavit was filed that no inmates were not being transferred to its Wheeling facility because, as it is its own facility, it would be aware of any inmates being transferred there.  Id. at 3:12:36.  Thus, defendant argued, plaintiff had no justification for raising the argument for the

Plaintiff provides no evidence or case law to support its argument that an agency must choose the incumbent contractor when contemplating an interim contract or the extension of a pre-existing contract.  Further, the presumption of agency regularity renders an explanation unnecessary "unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious."  Impresa, 238 F.3d at 1338.  Plaintiff abandoned any claim related to bad faith at oral argument, see supra Section II, and thus, those arguments are deemed withdrawn.

In sum, because the separate, pre-existing contract between the BOP and Dismas, as well as the separate, existing contract between the BOP and Renewal, are distinct from the contract awarded pursuant to the June 2012 solicitation, the court finds that the transfer of inmates to defendant-intervenor's facility in Charleston, West Virginia and Renewal's facility in Pittsburgh, Pennsylvania was not a de facto override of the automatic CICA stay.  See Access Sys., 84 Fed. Cl. at 243 (finding that because the other contract was different from the contract subject to the protest, it was "not an override of the automatic stay" required by CICA).  The absence of an override leads inextricably to the conclusion that the automatic stay pursuant to CICA was not violated.  Accordingly, the court need not engage in a merits evaluation concerning whether a de facto override of the stay was defensible.

## V. CONCLUSION

The BOP's use of a pre-existing RRC Services contract with Dismas and its use of an existing contract with Renewal to transfer inmates is separate and distinct from its March 30,

---

first time in its reply brief.  Id. at 3:14:30.  Plaintiff then responded that when it argued that the BOP should have considered plaintiff's Wheeling facility as an option when transferring inmates, plaintiff was not raising a new protest ground.  Oral Argument of May 15, 2015, Argument of Mr. Joseph A. Camardo at 3:24:50.  Rather, plaintiff explained, it was merely providing a reason as to why defendant did not satisfy the four factors set forth in Reilly's that determine if an agency's override decision should be upheld as valid.  Id. at 3:24:50-3:25:48; see Reilly's, 73 Fed. Cl. at 711.  Because the court has determined that no de facto override occurred, it need not reach the Reilly's analysis that plaintiff references, and consequently, it need not consider plaintiff's argument that the BOP should have transferred inmates to the Wheeling facility.  Moreover, even if plaintiff had attempted to raise the argument as a new ground to challenge the agency's action, it would be waived because it was first introduced in the reply brief.  United States v. Ford Motor Co., 463 F.3d 1267, 1277 (Fed. Cir. 2006) (explaining that "[a]rguments raised for the first time in a reply brief are not properly before this court" and that "[i]t is unfair to consider an argument to which the government has been given no opportunity to respond"); Norman v. United States, 429 F.3d 1081, 1091 n.5 (Fed. Cir. 2005) (adhering to the rule that arguments raised for the first time in a reply brief are not properly before the court); Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (stating that raising an issue "for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration"); Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 338 n.11 (2009) (holding that arguments presented for the first time in a reply brief should be disregarded by the court).

2015 contract award to Dismas arising from the June 2012 solicitation.  Because the court finds that the transfer of inmates did not constitute a de facto override of the automatic stay required by CICA, plaintiff has not met its burden to establish its entitlement to a preliminary injunction. Accordingly, the court **GRANTS** defendant's cross-motion for judgment on the administrative record, and **DENIES** plaintiff's motion for a preliminary injunction.  No costs.  The clerk is directed to enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine proposed redactions, and **by no later than Friday, June 12, 2015**, file a joint status report indicating their proposed redactions.  **A copy of those pages of the court's ruling containing proposed redactions shall be attached, with the proposed redactions clearly indicated, to the parties' status report**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge